THE HONORABLE JOHN C. COUGHENOUR

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| MAMMAR AMEUR, | Civil Action No. |
| Plaintiff, | PLAINTIFF'S **FIRST AMENDED** COMPLAINT FOR DAMAGES FOR |
| v. | FORCED DISAPPEARANCE; PROLONGED ARBITRARY DETENTION; |
| ROBERT M. GATES, in his individual capacity; DONALD RUMSFELD, in his individual capacity; PAUL WOLFOWITZ, in his individual capacity; GORDON ENGLAND, in his individual capacity; JAMES M. McGARRAH, in his individual capacity; RICHARD B. MYERS, in his individual capacity; PETER PACE, in his individual capacity; MICHAEL GLENN "MIKE" MULLEN, in his individual capacity; | CRUEL, INHUMAN, AND DEGRADING TREATMENT; TORTURE; WAR CRIMES FOR TARGETING A CIVILIAN; AND VIOLATION OF DUE PROCESS, ALL IN VIOLATION OF THE LAWS OF NATIONS PURSUANT TO THE ALIEN TORT STATUTE, AND THE FIRST AND FIFTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (BIVENS CLAIMS) |
| JAMES T. HILL, in his individual capacity; BANTZ CRADDOCK, in his individual capacity; GEOFFREY D. MILLER, in his individual capacity; JAY HOOD, in his individual capacity; HARRY B. HARRIS, Jr., in his individual capacity; MARK H. BUZBY, in his individual capacity; ADOLPH McQUEEN, in his individual capacity; NELSON CANNON, in his individual capacity; MICHAEL BUMGARNER, in his individual capacity; WADE DENNIS, in his | **JURY DEMAND** |

FIRST AMENDED COMPLAINT
2:11-cv-01671-JCC
PAGE 1 OF 62

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1  individual capacity; BRUCE VARGO, in his     )
   individual capacity; ESTEBAN RODRIGUEZ, )
2  in his individual capacity; DANIEL            )
   MCNEILL, in his individual capacity;          )
3  GREGORY J. IHDE, in his individual            )
   capacity; JOHN DOE 1, in his individual       )
4  capacity; JOHN DOE 2, in his individual       )
   capacity; JOHN DOE 3, in his individual       )
5  capacity; JOHN DOES 4-100, in their           )
   individual capacities,                        )
6                                                )
         Defendants.                             )
7  _____ )

8                        **COMPLAINT**

9        Plaintiff Mammar Ameur ("Mr. Ameur" or "Plaintiff"), by and through his counsel,

10  respectfully alleges the following:

11                **I.    PRELIMINARY STATEMENT**

12       1.      Mr. Ameur, Plaintiff, brings this action on behalf of himself.

13       2.      Mr. Ameur is a fifty-four-year-old native, citizen, and current resident of Algeria.

14  The United States military released him from Guantánamo Bay Naval Base (hereinafter

15  "Guantánamo" or "Guantánamo Bay") and allowed him to return home to Algeria on October 8,

16  2008, after unlawfully seizing him from his home in Pakistan on July 18, 2002, and unlawfully

17  holding him for over six years, subjecting him to torture and cruel, inhuman, and degrading

18  treatment.  Moreover, U.S. officials continued to unlawfully hold him and subject him to cruel,

19  inhuman, and degrading treatment for nearly three years after authorizing his return home to

20  Algeria.

21       3.      Mr. Ameur has never engaged in terrorism, acts supporting terrorism, or violence

22  against the United States or its citizens.  He did not commit any belligerent act, and did not

23  support hostilities in aid of enemy armed forces.  He was not seized from the battlefield, but

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

from his private home at the direction of, upon information and belief, a U.S. citizen working under color of law of the United States, but outside the scope of his employment and authorization.

4.     During the summer of 2002, Mr. Ameur and his family were living in Pakistan as refugees, as determined by the United Nations High Commission for Refugees (UNHCR), having fled their homeland of Algeria to escape the violent civil war in that country.  As a UNHCR-mandate refugee, he was under the protection of the United Nations and the host country of Pakistan.  Although he was a UNHCR-mandate refugee, as well as a civilian and an innocent humanitarian aid worker, Mr. Ameur was unlawfully seized from his apartment in Pakistan in July 2002, upon information and belief, at the direction of an American official. After being unlawfully held in Pakistan and at the U.S. Bagram Air Base in Bagram, Afghanistan ("Bagram") where U.S. citizens subjected him to torture and cruel, inhuman, and degrading treatment, Mr. Ameur was transferred to the U.S. Guantánamo Bay Naval Base ("Guantánamo") in Guantánamo Bay, Cuba, in March 2003.  U.S. officials unlawfully held him there until October 2008.  During the time at Guantánamo, U.S. officials subjected him to torture and to cruel, inhuman, and degrading treatment.  All of these acts were done at the direction of, or by, American citizens affiliated with the United States government or military.

5.     Defendants were acting outside the scope of their authority when they committed, directed, ordered, confirmed, ratified, had command responsibility for, aided and abetted, conspired to, encouraged, or condoned directly or indirectly all such acts which violated customary international law and Common Article III of the Geneva Conventions, and were outside of those allowed in the Army Field Manual.

6.     In addition, upon information and belief, Defendants were acting outside the

FIRST AMENDED COMPLAINT
2:11-cv-01671-JCC
PAGE 3 OF 62

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

scope of their authority and/or employment when they engaged in all those acts described herein against civilians they knew, or should have known, were innocent of engaging in terrorism, acts supporting terrorism, violence against the United States or its citizen, committing any belligerent act against, or supporting hostilities in aid of enemy armed forces (hereinafter "innocent"). Upon information and belief, the scope of Defendants' authority, *at most*, was limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizens, or had supported hostilities in aid of enemy armed forces. Upon information and belief, Defendants' scope of authority did not extend to engaging in such acts against those who they knew, or should have known through sufficient due process, were innocent.

7.     Certain officials within the U.S. government, including Defendants, knew or should have known that many of the men seized and held at Guantánamo Bay and Bagram were innocent. Mr. Ameur was one of these innocent men.

8.     As described by Col. Lawrence B. Wilkerson (Ret.), a former high-level official with the United States government, in a declaration in Plaintiff's counsel's possession, certain United States officials, including Defendants Rumsfeld and Gates, knew that innocent men had been unlawfully seized and were being held at Guantánamo Bay. They simply refused to release them out of fear of political repercussions. In addition, there was no meaningful way to determine who was an enemy combatant and who was not, both in the field and at Guantánamo Bay. Defendants knew or should have known of this deficiency.

9.     Mr. Ameur is married with four children. The illegal actions against Mr. Ameur resulted in loss of income to his wife and children, leaving them destitute.

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

10.     In total, Mr. Ameur was detained for over six years. Mr. Ameur was never properly charged nor tried for any criminal act.  Mr. Ameur was under the exclusive control of the Defendants and other officials of the United States at Bagram and Guantánamo for all but six months of that time.  During those six months, he was detained without charge in a Pakistani prison near Islamabad by, or with assistance of, American officials who, upon information and belief, were acting outside the scope of their authority in detaining Mr. Ameur.

11.     Not until October 26, 2004, over two years after his initial detention, was Mr. Ameur officially labeled an "enemy combatant" by the flawed Combatant Status Review Tribunal (CSRT) process.  Upon information and belief, the basis for Mr. Ameur's enemy combatant determination was simply because of his association as an employee of various organizations for whom he had done humanitarian and charity work, and the mandatory training he received for the Algerian army from 1979-1981, almost two decades prior.  Mr. Ameur was not given notice of the basis for his detention until the CSRT was convened between July and October 2004, more than two years after he was first detained.

12.     Flaws in the CSRT process include the following: (1) detainees are not afforded adequate due process, (2) detainees are presumed guilty of being enemy combatants, (3) detainees are not permitted to review classified evidence that is used to justify an enemy combatant determination, (4) detainees are not afforded access to counsel, and (5) detainees are not permitted to present their own witnesses or evidence.  Defendants knew that the detainees were not receiving adequate due process required by the U.S. Constitution and international law, but continued the unlawful detention of men, including Plaintiff, notwithstanding this knowledge.

13.     The United States military had actually cleared Mr. Ameur for return home to

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

Algeria on November 4, 2005.  However, it was not until February 2007, that Mr. Ameur's pro bono habeas counsel was notified via electronic mail that Mr. Ameur was eligible for transfer back home to Algeria.  It was not until September 4, 2007, nearly two years after Mr. Ameur was cleared for transfer, that he was personally notified.  A heavily censored copy of this clearance decision confirms that the decision to clear Mr. Ameur for return home was made shortly after the Administrative Review Board ("ARB"), a board that is supposed to annually review the detention of individuals that U.S. officials are holding at Guantánamo Bay, reviewed his case.

14.     Despite the ARB's decision and its email notification, U.S. officials (including some of the defendants, such as Defendant Gates), acting outside the scope of their authority, continued to unlawfully detain Mr. Ameur.  They did not allow him to return to Algeria until October 8, 2008.  In his habeas proceeding, the court ordered the United States to provide Mr. Ameur's pro bono habeas counsel with a "factual return" – the evidence justifying his being held - regarding Mr. Ameur's detention.  The U.S. officials allowed Mr. Ameur to return to Algeria approximately two weeks ahead of that court-ordered deadline.

15.     Plaintiff seeks compensation for unlawful forced disappearance; prolonged arbitrary detention; inhuman, degrading and cruel treatment; torture; being targeted during time of war as a civilian; and due process violations, all of which Plaintiff suffered while under the custody of certain United States officials at Bagram and Guantánamo who were acting outside the scope of their employment.

16.     Plaintiff brings this action for compensatory and punitive damages against Defendants for their roles in the harms committed against Plaintiff in violation of domestic and international law.  Defendants exercised command responsibility over, conspired with, aided

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

and abetted subordinates, and/or directly or indirectly participated in the commission of abusive and illegal practices alleged herein, including (but not limited to) prolonged arbitrary detention, cruel, inhuman, or degrading treatment, due process violations, violations of the First Amendment to the U.S. Constitution, and torture of Plaintiff at Bagram and Guantánamo. Accordingly, Defendants are liable in their individual capacities under domestic and international law for the injuries, pain, and suffering of Plaintiff.

## II.    JURISDICTION AND VENUE

17.     This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1350 (Alien Tort Statute).  As an alternative to federal question jurisdiction, this Court also has jurisdiction under 28 U.S.C. § 1332 (diversity jurisdiction).

18.     The Military Commissions Act (MCA) jurisdiction stripping provision, Section 7, which amends 28 U.S.C. § 2241, does not prevent this Court from exercising jurisdiction, for reasons including, but not limited to:

    a.  The Supreme Court in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), invalidated § 7 in its entirety;

    b.  Even if U.S.C. § 2241(e)(2) survived *Boumediene*, the provision is unconstitutional on other grounds;

    c.  The provision is an unconstitutional bill of attainder;

    d.  The provision is not applicable to Mr. Ameur because, *inter alia*, he was not properly determined to be an enemy combatant.

19.     This action is brought pursuant to violations of the law of nations under the Alien Tort Statute and also brought directly under the Fifth Amendment to the United States Constitution.  As an alternative, Plaintiff's claims for violation of the law of nations (customary international law) may also be brought under state common law.

20.     Venue is proper in the United States District Court of Western Washington

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

pursuant to 28 U.S.C. § 1391(b)(3) as Defendant Robert M. Gates is domiciled there.

### III.   PARTIES

#### Plaintiff

21.     Mammar Ameur, a fifty-four-year-old native, citizen, and current resident of Algeria, is married with four children.  Mr. Ameur was unlawfully taken without probable cause, upon information and belief, at the direction of an unknown American official on July 18, 2002.  He was held as a prisoner under the exclusive control of the United States at Bagram from approximately January 2003 until his transfer on approximately March 15, 2003 to Guantánamo, where his illegal detention continued until he was returned to Algeria on approximately October 8, 2008.

#### Defendants

22.     Defendant Robert M. Gates is a United States citizen domiciled in Washington State.  Defendant Gates owns property in Washington State, including residences, has publicly acknowledged intentions to return to Washington State after employment with the United States government, and upon information and belief, has at various times resided in Washington State. Defendant Gates was the United States Secretary of Defense from December 18, 2006, until July 1, 2011, including the period of time in which some of the events herein described occurred. As the Secretary of Defense, Defendant Gates held the highest rank in the military command structure, other than the President of the United States.  At all relevant times, Defendant Gates also held the highest position in the Department of Defense, and in this capacity possessed and exercised command and control over the United States military and the United States detention facility at Guantánamo.  During the time of his tenure, Defendant Gates was in charge of all military forces, and he was responsible for overseeing detainee detention

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

and interrogation, a large part of military intelligence acquisition.  Therefore, he was ultimately in charge of Plaintiff's continued unlawful detention and illegal treatment after he became Secretary of Defense.

23.     Pursuant to 10 U.S.C. § 113, the Secretary of Defense has authority, direction and control over the Department of Defense. The Secretary of Defense also exercises statutory "authority, direction and control" over the three Secretaries of the military departments (Secretary of the Army, Secretary of the Navy, and Secretary of the Air Force), the Chairman of the Joint Chiefs of Staff, the other members of the Joint Chiefs of Staff (Vice Chairman of the Joint Chiefs of Staff, Army Chief of Staff, Commandant of the Marine Corps, Chief of Naval Operations, and Air Force Chief of Staff), the Combatant Commanders of the Unified Combatant Commands, the Directors of the Defense Agencies (for example the Director of the National Security Agency) and of the United States Department of Defense  Field Activities. The Secretary is authorized to act as convening authority in the military justice system. Moreover, the section provides that the Secretary of Defense, with the approval of the President and after consultation with the Chairman of the Joint Chiefs of Staff, provides to the Chairman written policy guidance for the preparation and review of contingency plans, including plans for providing support to civil authorities in an incident of national significance or a catastrophic incident, for homeland3333 defense, and for military support to civil authorities.  Such guidance is required to be provided every two years or more frequently as needed and is to include guidance on the specific force levels and specific supporting resource levels projected to be available for the period of time for which such plans are to be effective.

24.     In addition, the Detainee Treatment Act, § 1005(e)(2)(C) (119 Stat. 2742) provides that the Secretary of Defense is responsible for the standards and procedures of the

FIRST AMENDED COMPLAINT
2:11-cv-01671-JCC
PAGE 9 OF 62

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

CRSTs.   In that capacity, Defendant Gates was responsible for directly overseeing detainee detention, treatment, and interrogation during the time he was secretary.   Defendant Gates had a duty to implement the policies and procedures regarding the CSRTs, approve authority to transfer, and control homeland security.   The National Defense Authorization Act, 2005, requires that the Secretary of Defense submit an annual report to Congress that includes, among other things, the number of individuals determined to be enemy combatants.   Moreover, according to the Department of Defense Administrative Review Board, the Secretary of Defense may suspend or amend procedures at his complete discretion.   Furthermore, notification of ARB recommendations is required to be forwarded to Department of Defense ("DoD").   The Designated Civilian Official notifies the Secretary of Defense of decisions to transfer detainees and coordinates with DoD to implement transfer.

25.     Plaintiff sues Defendant Gates in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, violating his legal/statutory duty to supervise and control his subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.   He is sued in his individual capacity, because it is alleged that in engaging in the conduct for which Plaintiff sues him, Defendant Gates was, upon information and belief, acting outside the scope of his authority – the scope of his authority, at most, being limited to engaging in said acts against those for whom a reasonable basis existed had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.   In addition, Defendant Gates was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

Geneva Conventions, as well as for acts outside of those authorized in the Army Field Manual.

26.     Defendant Donald H. Rumsfeld is a United States citizen residing in Illinois. Defendant Rumsfeld was the United States Secretary of Defense from January 20, 2001 until December 18, 2006, including the period of time in which the events herein described began. As the Secretary of Defense, Defendant Rumsfeld held the highest rank in the military command structure, other than the President of the United States.   At all relevant times, Defendant Rumsfeld held the highest position in the Department of Defense, and in this capacity possessed and exercised command and control over the United States military and the United States detention facility at Guantánamo.   At all relevant times, Defendant Rumsfeld was in charge of all military forces, and he was responsible for overseeing detainee interrogation, a large part of military intelligence acquisition.   Therefore, he was ultimately in charge of Plaintiff's continued unlawful detention and illegal treatment.   Defendant Rumsfeld is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.   In committing the illegal acts alleged herein, Defendant Rumsfeld, upon information and belief, was acting outside the scope of his authority - the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.   In addition, Defendant Rumsfeld was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as for those acts outside of those authorized by the Army Field Manual.

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

27.     Plaintiff incorporates paragraphs 23-25 herein, as applicable to Defendant Rumsfeld while he was Secretary of Defense.

28.     Defendant Paul Wolfowitz is a United States citizen residing in Maryland. Defendant Wolfowitz was Deputy Secretary of Defense from March 2, 2001 until March 17, 2005, including the period of time in which events herein described occurred.  In particular, Mr. Wolfowitz was responsible for creating and overseeing the implementation of the flawed CSRTs, through memoranda which called for specific treatment of detainees.  Defendant Wolfowitz is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In committing the illegal acts alleged herein, Defendant Wolfowitz was acting, upon information and belief, outside the scope of his authority - the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as for those acts outside of those authorized by the Army Field Manual.

29.     Defendant Gordon England is a United States citizen and was Secretary of the Navy from October 1, 2003 until December 28, 2005 and was simultaneously the Designated Civilian Official of detainees from June 28, 2003 until May 12, 2005.  During this period and in this capacity, Mr. England had a large role in determining whether a detainee should be released

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

or not, based on the recommendations of a CSRT or ARB.  Mr. England was also Deputy Secretary of Defense from May 13, 2005 until February 20, 2009, including the period of time in which events herein described occurred.  During this period and in this capacity, Mr. England continued to oversee the flawed CSRT and ARB processes.  Defendant England is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In committing the illegal acts alleged herein, Defendant England was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, and for acts beyond those authorized in the Army Field Manual.

30.     Defendant James M. McGarrah, RADM, CEC, USN, is a United States citizen and was the Director of the Office for the Administrative Review of the Detention of Enemy Combatants (OARDEC) and the CSRT from July 2004 until March 2006.  In this capacity, he helped develop the flawed ARB process and approved the CSRT recommendation that Plaintiff be designated an enemy combatant and that the case be considered final in a determination signed March 18, 2005.  Defendant McGarrah is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In committing the illegal acts alleged herein, Defendant McGarrah was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as for those acts outside of those authorized by the Army Field Manual.

31.     Defendant Air Force Gen. Richard B. Myers is a United States citizen. Defendant Myers was the Chairman of the Joint Chiefs of Staff from October 1, 2001 until October 1, 2005.  As the senior uniformed military officer in the chain of command during March 2003 until October 2005, Defendant Myers possessed and exercised command and control over the United States military and the United States detention facility at Guantánamo. Defendant Myers is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged. In committing the illegal acts alleged herein,  Defendant Myers was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the defendant was acting outside the scope of his authority for

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as for those acts outside of those authorized by the Army Field Manual.

32.     Defendant Marine Gen. Peter Pace is a United States citizen.  Defendant Pace was the Chairman of the Joint Chiefs of Staff from September 30, 2005 until October 1, 2007. As the senior military officer in the chain of command during his tenure as the Chairman of the Joint Chiefs of Staff, Defendant Pace possessed and exercised command and control over the United States military and the United States detention facility at Guantánamo.  Defendant Pace is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.   In committing the illegal acts alleged herein, Defendant Pace was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army Field Manual.

33.     Defendant Admiral Michael Glenn "Mike" Mullen is a United States citizen. Defendant Mullen was the Chairman of the Joint Chiefs of Staff from October 1, 2007, until September 30, 2011.  In his role, he visited Washington State several times. As the senior military officer in the chain of command, Defendant Mullen possessed and exercised command

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

and control over the United States military and the United States detention facility at Guantánamo.  Defendant Mullen is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In committing the illegal acts alleged herein, Defendant Mullen was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army Field Manual.

34.     Defendant Army Gen. James T. Hill is a United States citizen.  Defendant Hill lived in Pierce County, Washington, from September 1999 until August 2002, while serving as Commanding General, I Corps at Fort Lewis.  Furthermore, Defendant Hill traveled to the State of Washington on at least six occasions between January 2006 and October of 2008 to conduct business in Washington State pursuant to a consulting contract with Northrop Grumman.  Additionally, Defendant Hill owns and manages The J.T. Hill Group Inc., a consulting firm.  The website for the company references his work in Washington State and advertises his contacts and experience gained while living in Washington State.

35.     Defendant Hill was the Commanding General of the United States Southern Command (USSOUTHCOM) from August 18, 2002 until November 9, 2004.  During his tenure

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

as the senior commander with authority over the United States detention facility at Guantánamo, Defendant Hill possessed and exercised command and control over subordinates at Guantánamo. Defendant Hill is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged. In committing the illegal acts alleged herein, Defendant Hill was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces. In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as acts that went beyond the Army Field Manual.

36.     Defendant Army Gen. Bantz Craddock is a United States citizen. Defendant Craddock was the Commander of the United States Southern Command from November 9, 2004 until October 18, 2006. During his tenure as the senior commander with authority over the United States detention facility at Guantánamo, Defendant Craddock possessed and exercised command and control over subordinates at Guantánamo. Defendant Craddock is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged. In committing the illegal acts alleged herein, Defendant Craddock was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army Field Manual.

37.    Defendant Army Maj. Gen. Geoffrey D. Miller is a United States citizen. Defendant Miller was the Commander of Joint Task Force-Guantánamo, responsible for all operations at the detention facility at Guantánamo including the conduct of all interrogations from October 2002 until March 2004.  In March 2003, Defendant Miller authored and executed the Standard Operating Procedures at Camp Delta. During his tenure, Defendant Miller possessed and exercised command and control over subordinates at Guantánamo.  Defendant Miller is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In committing the illegal acts alleged herein, Defendant Miller was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army Field Manual.

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

38.     Defendant Army Brig. Gen. Jay Hood is a United States citizen.  Defendant Hood was the Commander of Joint Task Force-Guantánamo, responsible for all operations at the detention facility at Guantánamo including the conduct of all interrogations from March 2004 until March 2006.  During his tenure, Defendant Hood possessed and exercised command and control over subordinates at Guantánamo.  Defendant Hood is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In committing the illegal acts alleged herein, Defendant Hood was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army Field Manual.

39.     Defendant Navy Rear Adm. Harry B. Harris, Jr. is a United States citizen. Defendant Harris was stationed at Whidbey Island Naval Base in Washington State from 1994 to 1996.  Defendant Harris has owned property in Washington State, located in the Western District of Washington, for over 15 years.  Defendant Harris has continued to rent out the property – a home and adjacent land -- and he employs a property manager to manage his property in Washington State.   Thus, Defendant Harris has routinely and systematically conducted business in Washington State.  As a property owner in the State of Washington,

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

Defendant Harris has paid annual property taxes; in return, he is conferred certain benefits from tax-funded resources, including emergency fire services.  In fact, in 2003, law enforcement and rescue services responded to a fire at Defendant Harris' rental property.  In addition, Defendant Harris has continued to visit Washington State to attend various military ceremonies.

40.     Defendant Harris was the Commander of Joint Task Force-Guantánamo (JTF-GTMO) during 2006 and 2007, for over a year during the time in which Plaintiff was detained.  As Commander of JTF-GTMO, Defendant Harris was responsible for issuing, implementing and enforcing procedures and practices that touched every aspect of detainees', including Plaintiff's, daily existence.  In fact, Defendant Harris was responsible for all interrogation and operations in Guantánamo during this time.  In 2007, before Plaintiff was released, Defendant Harris was promoted to Director of Operations for the United States Southern Command (USSOUTHCOM).   In both positions, Defendant Harris oversaw all detainee operations at Guantánamo Bay.  Defendant Harris is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In committing the illegal acts alleged herein, Defendant Harris was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution,  customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

Field Manual.

41.    Defendant Rear Adm. Mark H. Buzby is a United States citizen.  Defendant Buzby was the Commander of Joint Task Force-Guantánamo, responsible for all operations at the detention facility at Guantánamo including the conduct of all interrogations from May 2007 until January 2008.  During his tenure, Defendant Buzby possessed and exercised command and control over subordinates at Guantánamo.  Defendant Buzby is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In committing the illegal acts alleged herein, Defendant Buzby was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army Field Manual.

42.    Defendant Army Col. Adolph McQueen is a United States citizen.  Defendant McQueen was the Commander of Joint Detention Operations Group at the United States detention facility at Guantánamo, responsible for guarding the detainees and providing security from November 2002 until August 2003.  During his tenure, Defendant McQueen possessed and exercised command and control over subordinates at Guantánamo.  Defendant McQueen is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In committing the illegal acts alleged herein, Defendant McQueen was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army Field Manual.

43.     Defendant Army Brig. Gen. Nelson Cannon is a United States citizen. Defendant Cannon was the Commander of Joint Detention Operations Group at the United States detention facility at Guantánamo, responsible for guarding the detainees and providing security from August 2003 until September 2004.  During his tenure, Defendant Cannon possessed and exercised command and control over subordinates at Guantánamo.  Defendant Cannon is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In committing the illegal acts alleged herein, Defendant Cannon was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

forces.  In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army Field Manual.

44.     Defendant Army Col. Michael "Mike" Bumgarner is a United States citizen. Defendant Bumgarner was the Commander of Joint Detention Operations Group at the United States detention facility at Guantánamo, responsible for guarding the detainees and providing security from April 2005 until March 2006.  During his tenure, Defendant Bumgarner possessed and exercised command and control over subordinates at Guantánamo.  Defendant Bumgarner is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged. In committing the illegal acts alleged herein, Defendant Bumgarner was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army Field Manual.

45.     Defendant Army Col. Wade Dennis is a United States citizen.  Defendant Dennis was the Commander of Joint Detention Operations Group at the U.S. detention facility at Guantánamo, responsible for guarding the detainees and providing security from March 2006 until June 2007.  During his tenure, Defendant Dennis possessed and exercised command and

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

control over subordinates at Guantánamo.  Defendant Dennis is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In committing the illegal acts alleged herein, Defendant Dennis was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army Field Manual.

46.    Defendant Army Col. Bruce Vargo is a United States citizen.  Defendant Vargo was the Commander of Joint Detention Operations Group at the United States detention facility at Guantánamo, responsible for guarding the detainees and providing security from July 2007 until Mr. Ameur's release in October 2008.  During his tenure, Defendant Vargo possessed and exercised command and control over subordinates at Guantánamo.  Defendant Vargo is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In committing the illegal acts alleged herein, Defendant Vargo was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army Field Manual.

47.     Defendant Esteban (aka Steven, aka Stephen) Rodriguez is a United States citizen.  Defendant Rodriguez was the civilian Director of the Joint Intelligence Group responsible for managing intelligence-gathering operations at Guantánamo and reporting to the Commander of the Joint Task Force at Guantánamo from July 2003 until October 2005.  During his tenure, Defendant Rodriguez possessed and exercised command and control over subordinates at Guantánamo.  Defendant Rodriguez is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In committing the illegal acts alleged herein, Defendant Rodriquez was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army Field Manual.

48.     Defendant Lt. General Daniel McNeill is a United States citizen.  In 1997 and

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1998, Defendant McNeill was a Deputy Commanding General at Ft. Lewis, an army base in Washington State, during which time he had hunting and fishing licenses with the State.   He continued to visit Ft. Lewis in his official capacity as a commanding general on more than one occasion between May 2004 and January 2007, the time during which Plaintiff's claims were accruing.   Defendant McNeill continued to visit Washington as a private citizen to conduct business, providing training on a consultant basis at Ft. Lewis on at least four occasions during 2009 and 2010.

49.   Defendant McNeill was Commander of the Combined Forces Command of Afghanistan for the entire duration of Plaintiff's detention at Bagram Air Base.   Defendant McNeill was responsible for all forces, intelligence activity, and treatment of prisoners in Afghanistan during his tenure.   During his tenure, Defendant McNeill possessed and exercised command and control over subordinates in Afghanistan.   Defendant McNeill is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.   In committing the illegal acts alleged herein, Defendant McNeill was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.   In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army Field Manual.

FIRST AMENDED COMPLAINT
2:11-cv-01671-JCC
PAGE 26 OF 62

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

50.     Defendant Brigadier General Gregory J. Ihde, a United States citizen, was the Commander of the United States Air Base in Bagram, Afghanistan, during the time Plaintiff was detained there from January 2003 to March 2003.  Defendant Ihde exercised command responsibility over, conspired with, aided and abetted subordinates, and/or directly or indirectly participated in Mr. Ameur's prolonged arbitrary detention, cruel, inhuman, or degrading treatment, torture, forced disappearance and due process violations at Bagram as hereinafter alleged.  In committing the illegal acts alleged herein, Defendant Ihde was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army Field Manual.

51.     Defendant John Doe 1, Colonel, United States Army Tribunal President is a United States citizen and presided over the flawed CSRT that recommended Plaintiff be designated an enemy combatant.  Defendant John Doe 1 is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In committing the illegal acts alleged herein, Defendant Doe was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces. In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army Field Manual.

52.    Defendant John Doe 2, is a United States citizen and was Presiding Officer of the flawed ARB, which recommended that Plaintiff be transferred back to the Algeria. Despite this recommendation, Defendant Doe 2 failed to provide or ensure proper notification to Plaintiff and/or Plaintiff's habeas counsel of the ARB's decision. Defendant John Doe 2 is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged. In committing the illegal acts alleged herein, Defendant Doe 2 was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces. In addition, the defendant was acting outside the scope of his authority for all acts that violated the U.S. Constitution, customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army Field Manual.

53.    Defendant John Doe 3 is a United States citizen. He commanded Pakistanis to take custody of Plaintiff, even though he had no basis – let alone a reasonable basis – to do so, other than the fact that Plaintiff was a refugee from Algeria residing in Pakistan. Defendant

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

John Doe 3 is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In committing the illegal acts alleged herein, Defendant Doe 3 was acting, upon information and belief, outside the scope of his authority -- the scope of his authority, at most, being limited to engaging in said acts against those for whom a reasonable basis existed to suspect they had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the defendant was acting outside the scope of his authority for all acts that violated customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army Field Manual.

54.     Plaintiff does not know the true names and capacities of Defendants sued herein as John Does 4-100, and therefore sues these Defendants by fictitious names.  John Does 4-100 are sued in their individual capacity, and are the military, intelligence, and civilian personnel who exercised command responsibility over, conspired with, aided and abetted subordinates, and/or directly or indirectly participated in Plaintiff's prolonged arbitrary detention, cruel, inhuman, or degrading treatment, torture, targeting of a civilian, forced disappearance and due process violations as hereinafter alleged.

55.     All Defendants named herein are sued in their individual capacity and are alleged to have acted, upon information and belief, outside the scope of their employment and/or authority, especially with regard to men such as Plaintiff, a civilian, who was not apprehended on a battlefield and for whom there was insufficient evidence to warrant his taking, detention or treatment.

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1

## IV.   STATEMENT OF FACTS

2

### Background

3       56.      From the outset of the War on Terror following the September 11, 2001 attacks,

4    Pakistan has been a key front-line ally to the United States.  As documented in the State

5    Department Report on Pakistan issued in March 2009, "The United States-Pakistan relationship

6    changed significantly once Pakistan agreed to support the United States' campaign to eliminate

7    the Taliban in Afghanistan and to join the United States in the Global War on Terror.  Since

8    September 2001, Pakistan has provided extensive assistance in the war on terror by capturing

9    more than 600 al-Qaida members and their allies.  The United States has stepped up its

10   economic assistance to Pakistan, providing debt relief and support for a major effort for

11   education reform."

12      57.      As part of this relationship change, the United States and Pakistan established the

13   Working Group on Counterterrorism and Law Enforcement Cooperation in 2002, with the first

14   meeting held in May of that year.  Around this time, United States involvement, particularly that

15   of the Federal Bureau of Investigation (FBI), with local Pakistani police increased.  It has been

16   reported that FBI agents actively took part in raids with local police, carrying weapons and

17   directing local police in nighttime arrests.

18      58.      The United States military has maintained continuous control and jurisdiction

19   over Bagram since December 2001, following the invasion of Afghanistan.  This control is

20   evidenced by the Lease Agreement and the Status of Forces Agreement (SOFA) between the

21   United States and Afghanistan.  The base has served as a primary staging center for the military

22   during Operation: Enduring Freedom.  It has also served as the primary known detention

23   centers, interrogation points, and transfer centers for detainees arrested in the region, including

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

Pakistan.  Numerous media reports and human rights organizations have documented the harsh conditions and treatment administered to detainees at Bagram, which were particularly harsh during the initial years of its operation under United States control.

59.   The United States has maintained exclusive and continuous control and jurisdiction over Guantánamo pursuant to a 1903 Lease Agreement with Cuba.  Beginning in early 2002, the United States began to transfer detainees seized throughout the world to Guantánamo.  Numerous media reports and human rights organizations have documented harsh conditions and treatment administered to detainees at Guantánamo.

60.   At Guantánamo, detainees have been held indefinitely without charges ever being filed against them.  Under the auspices of the United States Department of Defense (DOD), the Office for the Administrative Review of the Detention of Enemy Combatants (OARDEC) was created in 2004 to establish military tribunals to determine the status of the individuals detained at Guantánamo.  The two procedures established by OARDEC were the Combatant Status Review Tribunals (CSRT) and Administrative Review Boards (ARB).

61.   Pursuant to the Deputy Secretary of Defense memorandum, "Global Screening Criteria (GSC) for Detainees," dated February 20, 2004, the combatant commanders were responsible for assessing individuals over whom they obtained control in connection with the War On Terrorism operations to determine whether they are enemy combatants (EC) and were therefore subject to detention by DOD personnel.  The Undersecretary of Defense is subject to the authority, direction and control of the Secretary of Defense.  10 U.S.C. § 134.

62.   Detainees' statuses have been determined by a flawed CSRT procedure.  The process fails to provide for adequate due process in numerous ways because detainees are presumed guilty of being enemy combatants, not permitted to review classified evidence that is

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

used to justify an enemy combatant determination, not afforded access to counsel, and not permitted to present their own witnesses or evidence.

63.    Following an enemy combatant determination by a CSRT, a detainee's status is to be reviewed annually by an ARB.  The ARB is to recommend, based on current evidence at the time, whether the detainee should be released, transferred, or continue to be detained.  At its core, the ARB was designed to ensure no one was properly detained any longer than warranted. Department of Defense Principal Deputy General Counsel Daniel Dell' Orto described the ARBs to Congress as an "unprecedented" procedural protection "created . . . to ensure that [the United States] detain[s] individuals no longer than necessary." *Habeas Corpus for Detainees: Hearing Before the H. Armed Serv. Comm.*, 110th Cong. (July 26, 2007) (statement of Daniel J. Dell'Orto, Principal Deputy General Counsel, Department of Defense).  Other ranking officials in the Executive Branch have testified in similar terms. *See, e.g.*, *Legal Rights of Guantanamo Detainees*: Hearing Before the S. Judiciary Comm., 110th Cong. (Dec. 11, 2007) (statement of Steven A. Engel, Deputy Assistant Attorney General) ("To ensure that enemy combatants are not held any longer than necessary, the Department of Defense [established the ARBs]. Those tribunals reassess, on an annual basis for each detainee, the need for continued detention.").

## Facts Specific to Plaintiff

64.    Having fled their homeland of Algeria to escape the violent civil war in that country, Plaintiff and his family lived in Pakistan as refugees, as determined by the United Nations High Commission for Refugees (UNHCR), during the summer of 2002.  As an UNHCR-mandate refugee, he was under the protection of the United Nations and the host country of Pakistan.  Having difficulty living on funds provided to him by the United Nations as a refugee, and being unable to find work in Pakistan, Plaintiff and his family were preparing to

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

return to Algeria, as the civil war from which they fled had ended.

65.   On July 18, 2002, in the early-morning hours, just days before he and his family were scheduled to return to Algeria, Plaintiff was seized during a raid by Pakistani authorities, upon information and belief, at the direction of an unknown American official.   Numerous heavily armed men raided the private building in Peshawar, where Plaintiff lived with his family, initially seeking his upstairs neighbor. Plaintiff provided the men with his documentation from the UNHCR that identified him as a refugee from Algeria.   After initially ignoring Plaintiff, the Pakistani police took custody of him at the behest of their American leader, who took interest in Plaintiff, upon information and belief, based solely on his nationality, as reflected in his UNHCR document.   The Pakistani police informed the American leader that they had not come for Plaintiff, but sought his upstairs neighbor; that they did not need him; and that they did not desire to take him into custody.   The American official ignored their pleas and ordered that they take Plaintiff into custody.   Plaintiff's wife was informed that he would be detained for only two days.   After he was held in a local jail overnight, Plaintiff was transferred to a jail in Islamabad, Pakistan, on July 19, 2002, where he was held for three days with no outside contact, interrogated, and subjected to cruel, inhuman, and degrading treatment.

66.   On July 22, 2002, Plaintiff was hooded, chained with heavy metal links and old-fashioned padlocks, and transferred to another Pakistani prison.   It is possible that this location was in Islamabad; it is also possible that the location was at a site controlled/operated at least partly by the United States military.   During the five months that Plaintiff was held at the site, he received food laced with hot peppers and only one set of clothes to use throughout the summer heat and winter cold that spanned the time he spent there.   His opportunities to use the

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

restroom or shower were severely restricted and Plaintiff was allowed to see light only once or twice during this entire time.

67.     Plaintiff was never permitted outside contact with the ICRC, his family, consulate, or an attorney.  Plaintiff was never charged with a crime or interrogated.  His family did not know what had happened to him or where he was.

68.     In approximately January 2003, Plaintiff was hooded, chained, and driven in a van to be transferred once again.  The Pakistani police informed him that he was being transferred home.  However, that is not what occurred.  Upon arrival at a tarmac, Plaintiff was thrown to the ground, beaten and kicked, and retrussed in plastic zip-tie cuffs by American officials.  Plaintiff was then placed on a non-commercial flight to Bagram that lasted approximately one and one-half hours.

69.     Plaintiff was a prisoner under the exclusive control of the United States at Bagram Air Base from approximately January 2003 until approximately March 23, 2003.  Upon arrival at Bagram, American officials pushed and dragged Plaintiff outside in freezing temperatures, kicked him, cut his clothes off with a knife, forced him to lie on the ground naked, and took pictures of him.  He was also subjected to cavity searches.  They set dogs upon Plaintiff while United States military personnel, including female personnel, laughed and mocked him.

70.     While at Bagram, Plaintiff was forced to stand for long periods of time without sleep or food.  He was subjected to loud music, sound, and lights on all the time.  Plaintiff was also forced into intense stress positions, including being hung by his handcuffs.

71.     During his detention at Bagram, Plaintiff was subjected to prolonged arbitrary detention, cruel, inhuman, or degrading treatment, torture, and due process violations.  On one

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

occasion in early March 2003, Plaintiff was finally allowed to have contact with International

Committee of the Red Cross (ICRC). At that time, he was allowed to send one letter to his wife

through the ICRC. Until this time, he was deprived of all outside contact.

72.     During his detention at Bagram, Plaintiff did not receive any notice of the

reasons for his apprehension and detention.  Plaintiff was not charged with any crime or offense,

and he was deprived of any proceeding in which he could challenge the basis for his detention.

No evidence was presented against him. Rather, he was simply imprisoned without cause and

routinely subjected to harsh interrogations and abusive treatment.  Given his role at Bagram,

Defendant McNeill personally participated in violating Plaintiff's rights through his command

authority.

73.     On approximately March 23, 2003, Plaintiff was placed on an airplane for

transfer to Guantánamo Bay.  At that time, his beard and hair were shaved, he was subjected to

another cavity search, handcuffed, and forced to stay on his knees for nearly ten hours without

food, water, or access to a restroom.  Plaintiff was then shackled and blindfolded, had muffs

placed on his ears, and strapped down with a full-face hood for the entire flight to Guantánamo.

If the prisoners tried to move during the flight, the guards beat them.  Plaintiff was given a

bucket to use during the flight instead access to the restroom.

74.     Plaintiff was a prisoner under the exclusive control of the United States at

Guantánamo from approximately March 23, 2003, until his release and subsequent transfer to

Algeria on approximately October 8, 2008.  During this time, Plaintiff continued to be

interrogated and detained, despite no reasonable basis for such treatment.

75.      For the first month at Guantánamo, Plaintiff was held in isolation and

interrogated daily in Delta Camp 3, the harshest of the camps.  Plaintiff was then placed in

FIRST AMENDED COMPLAINT
2:11-cv-01671-JCC
PAGE 35 OF 62

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

Camp 1.  He was allowed only a 20-minute walk in the yard twice per week.

76.     Plaintiff was eventually moved to Camp 4.  However, during one month of his detention, Plaintiff was again placed in Camp 3, where the treatment was much worse than in Camp 4.

77.     While at Guantánamo Bay, Plaintiff was subjected to beatings from the guards.  He was allowed to take cold showers once a week, but only while chained and stripped.  If detainees refused to strip, the guards would beat them, so Plaintiff was forced to comply.  The guards also repeatedly sprayed all the detainees with mace and cut off the water supply so that the detainees could not clean it off.  Upon information and belief, the mace attacks were unprovoked and the guards were randomly subjecting the detainees to this treatment.  In addition, the guards punished all the detainees if there was a problem with one detainee.

78.     Treatment Plaintiff endured as punishment for other detainees' behavior included having his Qur'an taken away on several occasions, as well as his mattress, bed sheet, blankets, soap, toothbrush, and toothpaste.  Sometimes officers refused to let Plaintiff conduct his prayers.

79.     After he was in U.S. custody at Guantánamo Bay, Plaintiff was not allowed to contact his family until approximately June 2007, almost five years after his initial detainment, and then only with the help of the ICRC.  He wrote letters to his family, but they never reached him.  Nor did he receive letters from his family, even though they wrote to him.  He was never allowed to contact his family or wife by telephone, or any other method, for approximately five years.  At one point, Plaintiff asked a soldier if there was mail for him.  The soldier responded that he had seen mail for Plaintiff, but the soldier said that he was not allowed to give it to him.  On another occasion, Plaintiff wrote to a general at Guantánamo Bay informing him that he had

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

not received any mail from his family; the general replied that there was no mail for Plaintiff. Such restriction on his right of family life and communication with his family was unnecessary. In June 2007, with ICRC's help, he received letters from his wife, but they were redacted. Moreover, at that point, he was able to have telephone contact with his wife approximately twice per year. These additional restrictions, and redactions, further illegally burdened his constitutional right to communicate with his family and associate with them.

80.     As a result of the footwear provided to Plaintiff at Guantánamo Bay, Plaintiff received substantial injuries to both of his feet.  Infections in both of his heels and soles caused constant pain.  By December 2007, four separate doctors agreed that he should be provided with padded soled inserts for his shoes, but the head doctor refused to approve his request.  Plaintiff received a steroid injection in both soles, but he was unable to walk 25 yards without pain in his feet.  Plaintiff was also required to take a variety of pain killers, which still did not relieve the pain in his feet. Plaintiff eventually received inserts after the head doctor finally approved the fifth request in February 2008.

81.     Plaintiff's injuries to his feet continued to inflict substantial pain.  He was unable to walk for even moderate distances.  He could not stand for more than five minutes at a time which forced him to modify his prayers.  The effects of these injuries impacted his ability to work and function in daily activities even after his release from Guantánamo Bay.

82.     Before the CRST was convened sometime in July and October 2004, Plaintiff was not given notice of the basis of his detention for more than two years since he was initially detained.  Yet, the interrogations continued until Plaintiff's 2008 transfer, even though Plaintiff was approved for transfer over two years earlier.

83.     Under his authority as Commander-in-Chief, President George W. Bush, issued a

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

Military Order on November 13, 2001, authorizing indefinite detention without due process of law. Individuals subject to The Order are those that the President will determine "from time to time in writing" to be: 1) individuals who are or were members of al Qaida; 2) engaged in, aided or abetted, conspired to commit, acts of international terrorism or acts in preparation therefor, caused, threaten to cause, injury or adverse effects to the United States, its citizens, national security, foreign policy, or economy; or 3) harbored one or more individuals described in the first two sections. *See* Executive Order, 66 Fed. Reg. 57833 § 2 (November 13, 2001).

84. This Order was in effect when Plaintiff was detained. Over two years passed between Plaintiff's detainment and the initiation of the CSRT process. Prior to this two year gap, Plaintiff was never determined to be an "enemy combatant", supporting forces hostile to the United States, or coalition partners in Afghanistan. There was no finding that Plaintiff was a member of al-Qaida, involved in acts of international terrorism against the United States, or knowingly harboring anyone who had. Plaintiff was not subject to the Executive Order of November 13, 2001. There was no cause to detain Plaintiff.

85. Plaintiff was in the exclusive custody, care, and control of Defendants at Bagram and Guantánamo from January 2003 until his release and transfer to Algeria in October 2008. He was detained with Internment Serial Number (ISN) Number 939.

**CSRT Determination and ARB Review**

86. It was not until, October 2004- two years after his initial detention- that Plaintiff was officially labeled an "enemy combatant" by the flawed CSRT process. The CSRT itself did not afford Plaintiff elementary due process.

87. Upon information and belief, the military tribunal determined that Plaintiff was an enemy combatant simply because of his association as an employee of various organizations

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

for whom he had done humanitarian and charity work and the mandatory training he received for the Algerian army from 1979-1981, almost two decades prior to his detention.

88.     The CSRT's allegations against Plaintiff included that he was associated with the African Muslim Agency (AMA).  AMA is an organization that the U.S. State Department's Bureau of Democracy, Human Rights and Labor has recognized as doing important humanitarian work in Africa.  It is not on the list of terrorist organizations.

89.     The CSRT's determination of Plaintiff as an enemy combatant was reviewed only once by a military ARB, which was convened on August 15, 2005.  The purpose of the ARB is to provide annual review of the flawed CSRT procedures.  In November 2005, the ARB determined, upon information and belief, that Plaintiff was eligible for release from Guantánamo and could return to Algeria.

90.     Not until February 22, 2007, did Plaintiff's pro bono habeas counsel receive an email from OARDEC, notifying them that Plaintiff, based on either the ARB process or the process the Department of Defense had in place prior to ARBs, had in fact been "approved to leave Guantánamo."   This notification via email came eighteen months after the ARB determined that Plaintiff was eligible for return to Algeria.

91.     Despite the ARB determination and email notification, Plaintiff was not allowed to return to Algeria until approximately October 8, 2008.  In his habeas proceeding, the court ordered the United States to provide Plaintiff's pro bono habeas counsel with a factual return regarding his detention.  The U.S. officials allowed Plaintiff to return to Algeria approximately two weeks ahead of the deadline imposed by that court order.

92.     Certain officials within the U.S. government, including Defendants, knew or should have known, or believed that many of the men seized in Pakistan and Afghanistan and

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

held at Guantánamo Bay and Bagram were innocent.  Plaintiff was one of these innocent men.

93.     As sworn by Col. Lawrence B. Wilkerson (Ret.), a former high-level official with the United States government, certain United States officials, including Defendants Rumsfeld and Gates and most likely many of the other Defendants, knew that they had seized and were holding innocent men at Guantánamo Bay.  They simply refused to release them out of fear of political repercussions.  There was no meaningful way to determine who was an enemy combatant and who was not, either in the field or at Guantánamo Bay, and Defendants knew, or should have known, this.

94.     Upon information and belief, only five to seven percent of the men held at Guantánamo Bay were actually apprehended during military engagement or "on the battlefield." Nearly ninety-three to ninety-five percent of the men were not.  Many of these men were taken by Pakistanis and Afghans who received a bounty, or acted for purposes of retribution or revenge.  Upon information and belief, there was no credible effort to determine whether there was any suspicion or belief – let alone a *reasonable* suspicion or belief – that the men who were apprehended off the battlefield engaged in or supported hostilities toward or against the United States.

95.     As officers of the U.S. military, military official defendants' authority is limited by numerous legal documents and doctrines, including the Army Field Manual and the Geneva Conventions.  All actions taken, or not taken, with regard to Plaintiff, who was a civilian, that resulted in prolonged arbitrary detention, torture, cruel, inhuman and degrading treatment, violations of due process, forced disappearance, were outside such authority, and all defendants knew or should have known such actions were outside their legal authority, and were illegal.

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

**Additional Information on
the Role of Individual Defendants**

96.     Throughout the period when Defendant Rumsfeld was Secretary of Defense and exercised command authority over Guantánamo, he and his subordinates, including Defendants Miller, Hood, Harris, Hill, McQueen, Cannon, Bumgarner, and Dennis, oversaw a system of detention, coercive interrogations and harsh and humiliating conditions in contravention of the Geneva Conventions, customary international law, and the Army Field Manual.  Specifically, in October 2002, Defendant Rumsfeld ordered an overhaul of the operation at Guantánamo, resulting in new interrogation techniques that did not conform to the 1949 Geneva Conventions or customary international law and went beyond those approved in the U.S. Army Field Manual.  All Defendants knew or should have known that such techniques were unlawful.

97.     In a memo dated October 25, 2002, Defendant Hill made a written request for permission to use enhanced interrogation techniques, later used against Plaintiff, that constitute torture and cruel, inhuman and degrading treatment, in direct contradiction to the Geneva Conventions, customary international law, and the Army Field Manual.  Defendant Hill justified violations of the Geneva Convention in the use of such "counter-resistance techniques" by noting detainees' tenacious resistance against the more humane interrogation methods lawfully employed at the time.  He expressed reservations about the legality of the most severe methods (such as the implied or explicit use of threats of death to detainee and/or his family), but asked for authorization to use them nonetheless.

98.     In addition, during Defendant Hill's leadership, the ICRC reported that the military was intentionally using psychological and physical coercion "tantamount to torture" on prisoners, and that their treatment was increasingly "refined and repressive."

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

99.     Beginning on November 8, 2002, Defendant Miller commanded JTF-GTMO, a unit that combined the detention and security operations (JTF-160) and interrogation and intelligence-gathering functions (JRF-170).   In that position, he oversaw both military intelligence and military police functions.   Defendant Miller was in regular contact with Defendant Rumsfeld during his time as commander at Guantánamo.

100.    The Senate Armed Services Committee concluded in November 2008, based on its inquiry into the treatment of detainees in U.S. custody, that leaders at Guantánamo Bay, including Major General Geoffrey Miller, ignored warnings from DoD's Criminal Investigative Task Force and the FBI that the techniques were potentially unlawful.

101.    Defendant Wolfowitz discussed the use of aggressive interrogation techniques at Guantánamo with others in the Department of Defense leadership, and concurred in the November 27, 2002, recommendation to Defendant Rumsfeld that the majority of the aggressive techniques be approved, including stress positions, removal of clothing, use of phobias, and deprivation of light and auditory stimuli.   Defendant Wolfowitz encouraged others to use even more aggressive interrogation techniques and expressed dissatisfaction with the level of intelligence-gathering at Guantánamo.   Defendant Wolfowitz was well-informed of the day-to-day operations at Guantánamo, as he was briefed on at least a weekly basis by Defendant Miller during the latter's time as Commander of Guantánamo.

102.    On December 2, 2002, Defendant Rumsfeld authorized aggressive interrogation techniques.   On that date, Defendant Rumsfeld signed a memorandum approving numerous illegal interrogation methods, including putting detainees in "stress positions" for up to four hours, forcing detainees to strip naked, intimidating detainees with dogs, interrogating them for twenty hours at a time, forcing them to wear hoods, shaving their heads and beards, keeping

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

them in total darkness and silence, and using what was euphemistically called "mild, non-injurious physical contact" techniques.  Defendant Rumsfeld and all Defendants knew or should have known that these techniques were unlawful, and in contravention of the Geneva Conventions and customary international law.  Upon information and belief, they also knew or should have known that they were not authorized to use them against those who were innocent and/or for whom there was not a sufficient basis to be held in custody.

103.    Defendant Miller unified the command over military intelligence units and military police units, and had them work together to weaken detainees for interrogation.  After the approval of the harsh interrogation techniques in the December 2, 2002 memorandum by Defendant Rumsfeld, Defendant Miller implemented the techniques, which were designed to "soften up" detainees.  These included sleep deprivation, extended isolation, forcing detainees to stand or crouch in stress positions, stripping detainees and exposing them to extremes of heat and cold.  Plaintiff suffered from these techniques.  Defendant Miller and the other defendants knew or should have known that such techniques were in contravention of the U.S. Constitution, the Geneva Conventions, international law, and the Army Field Manual and thus not legal, and that they were not authorized to use them against innocent civilians.

104.    On January 15, 2003, Secretary Rumsfeld rescinded permission for the more controversial techniques, although upon information and belief, under Defendant Miller's command at Guantánamo, these techniques continued to be used.  Those defendants responsible for Guantánamo Bay and Bagram, upon information and belief, continued to use some of the techniques.  They were not authorized to do so.

105.    On March 21, 2003, Defendant Hill again sent a memorandum to Defendant Myers regarding the interrogation techniques that were temporarily rescinded by Defendant

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

Rumsfeld in January of that year.  Defendant Hill's March 21, 2003 memo stated that both he and Defendant Miller felt that approval of *all* previously authorized techniques (all of which had been placed in categories -- Categories I, II or III – depending on their level of severity) were "essential."  Defendant Hill stated that "both Geoff Miller and I believe that we need as many appropriate tools as possible" and called Category II techniques and the one previously-authorized Category III technique critical to maximizing our ability to accomplish the mission, now and in the future."  The "critical" techniques referred to by Defendant Hill included stress positions, deprivation of light and auditory stimuli, removal of clothing, use of detainee phobias such as dogs.  In a prior communication, Defendant Hill had been made aware that some of the techniques were likely not lawful and could expose interrogators to possible federal prosecution.

106.   In late March 2004, Defendant Miller promulgated Camp Delta Standard Operating Procedures.  Section 4.2 of those procedures outlined a Behavior Management Plan, the purpose being "to enhance and exploit the disorientation and disorganization felt by a newly arrived detainee in the interrogation process."  The Plan provided that during the first two weeks at Camp Delta, a detainee was to be classified as Level Five and housed in a Maximum Security Unity Block.  Among other things, during that time, the procedures called for no Koran, prayer beads, or prayer cap; no contact with the ICRC or a chaplain; and no books or mail privileges.

107.   On April 16, 2003, Defendant Rumsfeld issued the "Memorandum for the Commander, US Southern Command: Counter-Resistance Techniques in the War on Terrorism," which contains 24 interrogation techniques, with the proviso that "use of these techniques is limited to interrogations of unlawful combatants held at Guantánamo Bay, Cuba."  These techniques, however, were inconsistent with the United States' obligations under international law.  He and the other defendants knew or should have known that such techniques

FIRST AMENDED COMPLAINT
2:11-cv-01671-JCC
PAGE 44 OF 62

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

were illegal, and also that they were not authorized to use them on innocent civilians.   In addition, they were not authorized to use them against those who had not been properly determined to be unlawful combatants.

108.    Defendant Miller supported and approved these techniques and oversaw their implementation at a time when Plaintiff was detained at Guantánamo, even though he knew they were illegal under international law.

109.    Serious mistreatment of detainees was a constant, unrelenting theme under Defendant Miller's command.   In July 2003, Defendant Miller sought approval for an interrogation plan that included previously-banned interrogation techniques.   Moreover, upon information and belief, others held continued to suffer - techniques such as threats against themselves and threats against their families, even though, upon information and belief, these techniques had been ordered not to be used.

110.    Plaintiff was subjected to many of these techniques that were illegal under the Geneva Conventions and customary international law.

111.    On October 10, 2003, the ICRC conducted more than 500 interviews at Guantánamo before meeting with Defendant Miller and his top aides.   The ICRC voiced its concerns over the treatment of detainees, particularly with regard to the lack of a legal system for the detainees, the continued use of steel cages, the "excessive use of isolation" and the lack of repatriation for the detainees.   Defendant Miller objected to the conclusions and told the ICRC that interrogation techniques were none of their concern.

112.    Defendant Hood, commander of the Joint Task Force-Guantánamo, had knowledge of abuse amounting to torture but failed to address it while in a position to do so.   In confidential reports to Defendant Hood and other government officials in July 2004, the ICRC

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

charged that the military was intentionally using psychological and physical coercion, "tantamount to torture," on prisoners at Guantánamo. Defendant Hood conceded the futility of indefinite and arbitrary detention of detainees at Guantánamo. More than two years after the first prisoners were brought to Guantánamo, Defendant Hood acknowledged that "[t]here are significant numbers of men here, who once their cases are heard will probably be given over to their government or released." However, Plaintiff remained in detention without charge.

113.    On July 29, 2004, Defendant England, then Secretary of the Navy and the Designated Civilian Official of detainees, signed a memorandum implementing the CSRT procedures used at Guantánamo. By Defendant England's own admission, the CSRT procedures were not designed as legal proceedings. The procedures implemented ensured that panels would "rubber-stamp decisions already made rather than applying independent judgment as to whether those decisions were correct," according to a written statement of Lt. Col. Stephen Abrahams, who served on a CSRT panel in the Office for the Administrative Review of the Detention of Enemy Combatants, presented to the House Armed Services Committee on July 26, 2007. The implementation of the CSRT procedures deprived Plaintiff of due process and condemned him to prolonged arbitrary detention.

114.    In his role as director of OARDEC, Defendant England appointed Defendant McGarrah the "convening authority" to review all CSRT decisions, including that Plaintiff be designated an "enemy combatant" and that the case be considered final in a determination signed October 27, 2004. In that capacity Defendant McGarrah presided over the system that deprived Plaintiff of due process, condemned Plaintiff to prolonged arbitrary detention, and exposed him to continued abusive treatment.

115.    As Joint Detention Operation Group ("JDOG") Commander at Guantánamo with

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

the responsibility for guarding the detainees and providing security, Defendant Bumgarner played an integral role in implementing torture from April 2005 until March 2006. With his attitude toward detainees being that "we can't trust them any farther than we can throw them[,]" Defendant Bumgarner attempted to justify the mistreatment of detainees at Guantánamo by demonizing them through various public statements, including "they hate us" and "they will cut your throat in a heartbeat."

116.    Defendant Bumgarner demonstrated that he was unwilling and/or unable to bring the detention facility into compliance with the universal standards of humane treatment mandated by the Geneva Conventions of 1949. Defendant Bumgarner tolerated and failed to exercise adequate command responsibility over the treatment of detainees by his officers.

117.    While responsible for guarding and securing detainees, Defendant Bumgarner was aware, or should have been aware, that torture and cruel, inhuman, or degrading treatment of detainees at Guantánamo was occurring. Defendant Bumgarner ignored the manifest illegality of the treatment he authorized, implemented, and/or otherwise condoned during his tenure. Plaintiff suffered serious mistreatment and abuse under the tenure of Defendant Bumgarner.

118.    Defendant Cannon, as commander of the Joint Detention Operation Group failed to exercise sufficient command responsibility in response to incidents of detainee abuse committed at Guantánamo. Defendant Cannon failed to take action to investigate or punish his subordinates for abuses committed against Plaintiff.

119.    Defendant McNeill, in his role, was, upon information and belief, aware of abuses taking place in Bagram. In fact, an April 2003 memorandum to General Pace noted that Defendant McNeill had specifically endorsed aggressive interrogation techniques that would be

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

illegal under international law. Upon information and belief, he had been questioned by media about such abuses taking place there. Moreover, he did not give sufficient guidance to his subordinates regarding which interrogation measures were appropriate and which were not. At most, he condoned the abuses taking place there; at the very least, he failed to end them.

120. Defendant Gates, during the time he was Secretary of Defense, oversaw the detention of detainees, their treatment, and their interrogation. He affirmatively continued the practice regarding prolonged arbitrary detention of detainees, including Plaintiff, even though he knew, upon information and belief, that there were innocent men being held at Guantánamo Bay, such as Plaintiff. Upon information and belief, he also knew there were significant due process problems in the way the CSRT were operating, but even with this knowledge, he continued the practice of unlawfully detaining men at Guantánamo Bay, including Plaintiff.

121. In July 2006, the Deputy Secretary of Defense circulated a memorandum, cc'ing the Director of the CIA, Director of the FBI, Secretary of Homeland Security, and then-current Secretary of Defense Rumsfeld. The memo outlined the "Revised Implementation of Administrative Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantánamo Bay, Cuba." According to English, if the Secretary of Defense's named Designed Civilian Official decided to release or transfer a detainee, he was to notify the Secretary of Defense. In addition, it stated that the administrative review process was "instituted as a matter of discretion and thus, the Secretary of Defense may suspend or amend the procedures set forth...at any time in his complete discretion."

122. The memorandum illustrates implemented revisions and also verifies that Defendant Rumsfeld, and then Gates, had the authority to amend CRST procedures to afford detainees due process. Further, the DCO was on direct order to notify the Secretary of Defense

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

of all decisions to release detainees.  Thus, Defendant Gates was not only placed on notice of Plaintiff's release, but had the authority to order that Plaintiff receive due process.

123.    Moreover, Defendant Gates specifically knew of Plaintiff's complaints and allegations regarding being held unlawfully, because Plaintiff had pending habeas claims against several defendants, which later included Defendant Gates, in federal court in the District of Columbia.  (Defendant Gates was substituted as a Defendant as soon as he became Secretary of Defense in December 2006 (see Fed.R.Civ.Pr. 25(d)), which was also reflected in the caption in subsequent pleadings. D.D.C. Case Number 1:05cv00573).

124.    In February 2007, Defendant Gates appointed Susan J. Crawford as convening authority of the Guantánamo Military Commissions.   When she came in as Convening Authority,  she publicly stated that "the prosecution was unprepared" to bring cases to trial and that the implementation of such commissions was flawed.  Upon information and belief, she reported this to Defendant Gates, putting him on notice of the flawed systems at Guantánamo Bay.   Yet, Defendant Gates continued the practice to unlawfully detain men held at Guantánamo Bay, including Plaintiff.

125.    Defendant Gates failed in his duties to train, supervise, or control his subordinates with regard to their actions, which violated both the U.S. Constitution and international law.   Through is acts and failures, he also acquiesced in the Constitutional deprivations of Plaintiff by his subordinates.   His failures to act also showed a callous and reckless disregard for the rights of detained men, such as Plaintiff.

126.    In June 2007, 141 members of Congress sent a letter to then President Bush, which was copied to Secretary Gates, wherein they indicated that innocent men were being unlawfully held at Guantánamo Bay and that indefinitely holding men at Guantánamo Bay

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

without charging them with a crime was a violation of our country's commitment to the rule of law. They also indicated that they thought it was critical to restore habeas rights to these men, indicating they believed these men had the constitutional right to be free from indefinite detention at the hands of American officials.

127. On October 10, 2007, Morris D. Davis, the Chief Prosecutor for the Office of Military Commissions at Guantánamo Bay, Cuba, resigned in protest, concluding that full and fair trials were not possible, and that the system at Guantánamo Bay had become deeply politicized. Based on the foregoing, it is reasonable to conclude that Defendant Gates knew of problems regarding adequate due process and deeply flawed due process systems at Guantánamo Bay throughout the time he served as Secretary of Defense.

## Habeas Petition

128. Plaintiff submitted a petition for a writ of habeas corpus which was officially filed on March 22, 2005. An amended petition for the writ of habeas corpus was filed by his habeas counsel on July 9, 2008. The habeas process was delayed on numerous occasions due to the acts of the government. As a consequence of this and Plaintiff's eventual transfer to Algeria, no court opinion on the merits of Plaintiff's habeas petition was ever issued. Plaintiff's case was consolidated with other petitioners held in Guantánamo Bay, specifically to determine procedural issues. The consolidated cases were dismissed on November 9, 2009, by a federal district judge in the District of Columbia.

## V.   INJURIES

129. The wrongful acts of Defendants, as set forth above and herein, caused Plaintiff:

a. Ongoing physical injuries;

b. Ongoing emotional and psychological injuries;

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

c. Loss of earnings and earning capacity;

d. Loss of interfamilial relations;

e. Loss of reputation; and

f. Medical expenses, past and future.

## VI.   CLAIMS FOR RELIEF

130.    Plaintiff's causes of action arise under and violate domestic and international law, agreements, declarations, conventions, resolutions and treaties, including the following:

a. Customary international law and treaties of the United States;

b. Statutes and common law of the United States;

c. Common law of numerous states, including Washington;

d. Other applicable domestic, foreign, or international law.

## VII.   FIRST CLAIM FOR RELIEF

**Prolonged Arbitrary Detention as a Violation of Customary International Law and the Geneva Conventions under the ATS and State Common Law, Brought Against All Defendants in Their Individual Capacities**

131.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

132.    The acts described herein constitute prolonged arbitrary detention of Plaintiff in violation of customary international law and the Geneva Conventions, Common Article III, and are actionable under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated both customary international law and Common Article III prohibiting prolonged arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international treaties, domestic and international judicial decisions, and other authorities.

133.    All Defendants are liable for said conduct in that they, acting under color of law,

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

committed, directed, ordered, confirmed, ratified, had command responsibility for, aided and abetted, conspired to, and/or directly or indirectly participated in bringing about the prolonged arbitrary detention of Plaintiff.  Defendants intended and/or knew or should have known that prolonged arbitrary detention was being enforced by their subordinates and failed to prevent those abuses or punish those responsible.

134.    All Defendants practiced, encouraged, and/or condoned prolonged arbitrary detention of Plaintiff for over six years.

135.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered physical harm, emotional harm, and financial loss, all damages in an amount to be determined at trial.

## VIII.    SECOND CLAIM FOR RELIEF

### Cruel, Inhuman, or Degrading Treatment as a Violation of Customary International Law and the Geneva Conventions under the ATS and State Common Law, Brought Against All Defendants in Their Individual Capacities

136.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

137.    The acts described herein constitute cruel, inhuman, or degrading treatment of Plaintiff in violation of customary international law and Common Article III of the Geneva Conventions and are actionable under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated both customary international law and Article III prohibiting cruel, inhuman, or degrading treatment as reflected, expressed, and defined in multilateral treaties and other international treaties, domestic and international judicial decisions, and other authorities.

138.    Defendants are liable for said conduct in that they, under color of law, directed, ordered, confirmed, ratified, had command responsibility for, aided and abetted, conspired to,

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

and/or directly or indirectly participated in bringing about the cruel, inhuman, or degrading treatment of Plaintiff.  Defendants intended and/or knew or should have known that cruel, inhuman, or degrading treatment was being enforced by their subordinates and failed to prevent those abuses or punish those responsible.

139.    Defendants practiced, encouraged, and/or condoned cruel, inhuman, or degrading treatment of Plaintiff for over six years.

140.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered physical harm, emotional harm, and financial loss, all damages in an amount to be determined at trial.

## IX.    THIRD CLAIM FOR RELIEF

### Torture as a violation of Customary International Law and the Geneva Conventions under the ATS and State Common Law, Brought Against All Defendants in Their Individual Capacities

141.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

142.    The acts described herein constitute torture of Plaintiff in violation of customary international law and Common Article III of the Geneva Conventions and are actionable under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated both customary international law and Common Article III prohibition against torture as reflected, expressed, and defined in multilateral treaties and other international treaties, domestic and international judicial decisions, and other authorities.

143.    Defendants are liable for said conduct in that they, under color of law, committed, directed, ordered, confirmed, ratified, had command responsibility for, aided and abetted, conspired to, and/or directly or indirectly participated in bringing about the torture of

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

Plaintiff.   Defendants intended and/or knew or should have known that torture was being enforced by their subordinates and failed to prevent those abuses or punish those responsible.

144.   Defendants Gates, Rumsfeld, Myers, Pace, Mullen, Hill, Craddock, Miller, Hood, Harris, Buzby, McQueen, Cannon, Bumgarner, Dennis, Vargo, Rodriguez, McNeill and Ihde, Does 3-100 practiced, encouraged, and/or condoned torture of Plaintiff.

145.   As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered physical harm, emotional harm, and financial loss, all damages in an amount to be determined at trial.

## X.    FOURTH CLAIM FOR RELIEF

### Targeting of a Civilian as a Violation of Customary International Law and the Geneva Conventions under the ATS and State Common Law, Brought Against All Defendants in Their Individual Capacities

146.   Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

147.   The acts described herein constitute war crimes as acts against a private civilian, in violation of the Fourth Geneva Convention and Customary International Law, which strictly prohibit intentional acts upon a civilian.

148.   All Defendants are liable for said conduct in that they, acting under color of law, committed, directed, ordered, confirmed, ratified, had command responsibility for, aided and abetted, conspired to, and/or directly or indirectly participated in the bringing about the war crimes as acts against Plaintiff, a private civilian.

149.    All Defendants intended and/or knew or should have known that war crimes were being committed and enforced by their subordinates and failed to prevent those abuses or punish those responsible.  In accordance with the Army Field Manual, military commanders

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

may be responsible for war crimes committed by subordinate members of the armed forces, as in the instant case.

150.    All Defendants practiced, encouraged, and/or condoned war crimes against Plaintiff for over six years by targeting him as a civilian who never actively engaged in combat or directly supported hostilities.

151.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered physical harm, emotional harm, and financial loss, all damages in an amount to be determined at trial.

## XI.    FIFTH CLAIM FOR RELIEF

**<u>Violation of Due Process as a Violation of Customary International Law under the ATS and State Common Law, Brought Against all Defendants in Their Individual Capacities</u>**

152.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

153.    The acts described herein constitute violations of the life and liberty interests of Plaintiff in violation of the laws of nations and are actionable under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law requiring due process as reflected, expressed, and defined in multilateral treaties and other international treaties, domestic and international judicial decisions, and other authorities.

154.    All Defendants are liable for said conduct in that they, acting under color of law, committed, directed, ordered, confirmed, ratified, had command responsibility for, aided and abetted, conspired to, and/or directly or indirectly participated in bringing about violations of due process of Plaintiff.  Defendants intended and/or knew or should have known that due process violations were being enforced by their subordinates and failed to prevent those abuses

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1   or punish those responsible.

2       155.    All Defendants practiced, encouraged, and/or condoned due process violations of

3   Plaintiff for over six years.  Plaintiff was detained for more than two years before his status was

4   reviewed by a flawed CSRT.

5       156.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered

6   physical harm, emotional harm, and financial loss, all damages in an amount to be determined at

7   trial.

8                      **XII.    SIXTH CLAIM FOR RELIEF**

9   **Forced Disappearance as a Violation of Customary International Law under the ATS and**
10  **State Common Law, Brought Against Certain Defendants in Their Individual Capacities**

11      157.    Plaintiff repeats and re-alleges the allegations contained in the preceding

12  paragraphs of this Complaint as if fully set forth herein.

13      158.    The acts described herein constitute the forced disappearance of Plaintiff in

14  violation of the law of nations and are actionable under the Alien Tort Statute, 28 U.S.C. §

15  1350, in that the acts violated customary international law prohibiting forced disappearance as

16  reflected, expressed, and defined in multilateral treaties and other international treaties,

17  domestic and international judicial decisions, and other authorities.

18      159.    Defendants Rumsfeld, Myers, McNeill, Ihde, and Does 3-100 are liable for said

19  conduct in that they, acting under color of law, committed, directed, ordered, confirmed,

20  ratified, had command responsibility for, aided and abetted, conspired to, and/or directly or

21  indirectly participated in the forced disappearance of Plaintiff.  Defendants Rumsfeld, Myers,

22  McNeill, Ihde, and Does 3-100 intended and/or knew or should have known that Plaintiff's

23  disappearance was forced by their subordinates and failed to prevent those abuses or punish

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

those responsible.

160.    Defendants Rumsfeld, Myers, McNeill, Ihde, and Does 3-100 practiced, encouraged, and/or condoned the forced disappearance of Plaintiff for almost five years until the letters to his family stopped disappearing and were finally received.

161.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered physical harm, emotional harm, and financial loss, all damages in an amount to be determined at trial.

## XIII.   SEVENTH CLAIM FOR RELIEF

### United States Constitution, Fifth Amendment: Violation of Due Process, against Certain Defendants in Their Individual Capacities

162.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

163.    The acts described herein constitute violations of the life and liberty interests of Plaintiff in violation of the Fifth Amendment of the United States Constitution, which prohibits cruel and inhumane treatment constituting punishment.

164.    Defendants Gates, Rumsfeld, Wolfowitz, England, McGarrah, Myers, Pace, Mullen, Hill, Craddock, Miller, McNeill, Hood, Harris, Buzby, McQueen, Cannon, Bumgarner, Dennis, Vargo, Rodriguez, and Does 1 and 2 are liable for said conduct in that they, acting under color of law, committed, directed, ordered, confirmed, ratified, had command responsibility for, aided and abetted, conspired to, and/or directly or indirectly participated (in addition, through supervisory liability) in the bringing about of violations of Plaintiff's rights to due process.

165.    Defendants Gates, Rumsfeld, Wolfowitz, England, McGarrah, Myers, Pace,

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

Mullen, Hill, Craddock, Miller, McNeill, Hood, Harris, Buzby, McQueen, Cannon, Bumgarner, Dennis, Vargo, Rodriguez, and Does 1 and 2 intended and/or knew or should have known that due process violations were being enforced by their subordinates and failed to prevent those abuses or punish those responsible.   Defendants Gates, Rumsfeld, Wolfowitz, England, McGarrah, Myers, Pace, Mullen, Hill, Craddock, Miller, McNeill, Hood, Harris, Buzby, McQueen, Cannon, Bumgarner, Dennis, Vargo, Rodriguez, and Does 1, 2, and 3-100 practiced, encouraged, and/or condoned due process violations of Plaintiff for over six years.

166.    During the time Plaintiff was held in Guantánamo Bay, the Defendants were on notice that the detainees enjoyed various Constitutional rights which Defendants violated with their unlawful conduct.

167.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered physical harm, emotional harm, and financial loss, all damages in an amount to be determined at trial.

### XIV.    EIGHTH CLAIM FOR RELIEF

**Violation of the Right to Exercise the Freedom of Religion and the Right of Free Expression and Association found in the First Amendment to the United States Constitution Against Certain Individuals in Their Individual Capacity**

168.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

169.    The acts described herein constitute violations of Plaintiff's right to freely practice his religion secured by First Amendment of the United States Constitution, which prohibits infringement upon an individual's free exercise of religion.

170.    The acts described herein also constitute violations of Plaintiff's right of free expression, speech, and association (to his family and the ICRC) secured by the First

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

Amendment of the United States Constitution, which prohibits infringement upon an individual's right of expression and association.

171.     Defendants Gates, Rumsfeld, Myers, Pace, Mullen, Hill, Craddock, Miller, Hood, Harris, Buzby, McQueen, Cannon, Bumgarner, Dennis, Vargo, Rodriguez, and Does 4-100 are liable for said conduct in that they, acting under color of law, committed, directed, ordered, confirmed, ratified, had command responsibility for, aided and abetted, conspired to, and/or directly or indirectly participated (in addition, through supervisory liability) in the bringing about of violations of Plaintiff's free exercise of his religion.

172.     Defendants intended and/or knew or should have known that due process violations were being enforced by their subordinates and failed to prevent those abuses or punish those responsible.  Defendants practiced encouraged, and/or condoned violations of Plaintiff's right to freely exercise his religion for over six years.

173.     During the time Plaintiff was held in Guantánamo Bay, Defendants were on notice that the detainees enjoyed various Constitutional rights which Defendants violated with their unlawful conduct.

174.     As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered substantial infringement to his religious exercise, and his right to associate and communicate with his family, and thus damages in an amount to be determined at trial.

## XV.     NINTH CLAIM FOR RELIEF

### Violation of Religious Freedom Restoration Act, 42 U.S.C.A. § 2000bb-1, Against Certain Individuals in Their Individual Capacity

175.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

176.    The acts described herein constitute violation of Plaintiff's rights under the Religious Freedom Restoration Act, 42 U.S.C.A. § 2000bb-1, which prohibits infringement upon an individual's free exercise of religion without a compelling government interest.

177.    Defendants Gates, Rumsfeld, Myers, Pace, Mullen, Hill, Craddock, Miller, Hood, Harris, Buzby, McQueen, Cannon, Bumgarner, Dennis, Vargo, Rodriguez, and Does 4-100 are liable for said conduct in that they, acting under color of law, committed, directed, ordered, confirmed, ratified, had command responsibility for, aided and abetted, conspired to, and/or directly or indirectly participated (in addition, through supervisory liability) in the bringing about of violations of Plaintiff's free exercise of his religion.

178.    Defendants knew or should have known that due process violations were being enforced by their subordinates and failed to prevent those abuses or punish those responsible. Defendants practiced, encouraged, and/or condoned violations of Plaintiff's right to freely exercise his religion for over six years.

179.    During the time Plaintiff was held in Guantánamo Bay, Defendants were on notice that the government is not permitted to substantially infringe upon an individual's exercise of his or her religion, which Defendants violated through their unlawful conduct.

180.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered substantial infringement to his religious exercise, and thus damages in an amount to be determined at trial.

## XVI.    PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully requests the Court enter a judgment against Defendants:

181.    Awarding compensatory damages in an amount to be proven at trial that is fair, just, and reasonable;

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

182.    Awarding exemplary and punitive damages;

183.    Awarding reasonable attorneys' fees and costs of suit;

184.    Ordering such further relief as the Court may deem just and proper.


DATED this 5th day of March, 2012.

                              WILLAMETTE UNIVERSITY SCHOOL OF LAW
                              INTERNATIONAL HUMAN RIGHTS CLINIC


                              _____/s/ GWYNNE L. SKINNER_____
                              Gwynne L. Skinner, WSBA No. 23490,
                              OSB No. 022235
                              Attorney for Plaintiff
                              245 Winter St. SE
                              Salem, OR  97301
                              (503) 370-6140
                              gskinner@willamette.edu

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1

**CERTIFICATE OF SERVICE**

2

3      I hereby certify that on March 5, 2012, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system, which will send notification of this filing,

4      and a copy of the brief, to:

5

6      Paul E. Werner
       Trial Attorney
7      United States Department of Justice
       Torts Branch, Civil Division
8      P.O  Box 7146
       Ben Franklin Station
9      Washington, D.C. 20044

10
       WILLAMETTE UNIVERSITY SCHOOL OF LAW
11     INTERNATIONAL HUMAN RIGHTS CLINIC

12
        /s/ GWYNNE L. SKINNER
13     Gwynne L. Skinner, WSBA No. 23490
       OSB No. 022235
14     Attorney for Plaintiff

15

16

17

18

19

20

21

22

23

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433